UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| DOCLOGIC, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. _____ |
| | § | |
| AMERIDOC, LLC AND | § | Jury Demanded |
| TELADOC, INC., | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES, DOCLOGIC, LLC, Plaintiff, complaining of AMERIDOC, LLC and TELADOC, INC., Defendants, in Plaintiff's Original Complaint and for causes of action would respectfully show the Court as follows:

### I. PARTIES

1.     Plaintiff DocLogic, LLC ("DocLogic") is a limited liability company organized under the laws of Oregon which has its principal place of business in the state of Oregon.

2.     Defendant AmeriDoc, LLC ("AmeriDoc") is a limited liability company organized under the laws of Florida which has its principal place of business at 4965 Preston Park Blvd., Ste. 200, Plano, Collin County, Texas 75093.  It may be served through its registered agent David E. Lindsey at 14785 Preston Road, Suite 975, Dallas, Dallas County, Texas 75254.

3.     Defendant Teladoc, Inc. ("Teladoc") is a corporation organized under the laws of Delaware with its principal place of business at 4100 Spring Valley Road, Suite 515, Dallas, Dallas County, Texas 75244.  It may be served through its registered agent, Corporation Service

Company d/b/a CSC-Lawyers Incorporating Service Company at 1999 Bryan St., Ste. 900, Dallas, Dallas County, Texas 75201.

## II. JURISDICTION AND VENUE

4.      The Court has jurisdiction over this lawsuit under 28 U.S.C. §1332(a)(1) because the Plaintiff and Defendants are citizens of different states.  Plaintiff is an Oregon limited liability company that has its principal place of business in Oregon and is a citizen of that state. Neither DocLogic nor any of its owners is a citizen of Texas.  Defendants AmeriDoc and Teladoc have their principal places of business in Plano, Texas and Dallas, Texas, respectively. Further, Defendant AmeriDoc has waived any objection to lack of personal jurisdiction regarding any suit brought by Plaintiff DocLogic in a federal court in Collin County, Texas under its Agreement with Plaintiff DocLogic. (*See* "Agreement" attached as Exhibit A pp. 4-5)

5.      The Court has jurisdiction of this case because the amount in controversy exceeds $75,000, excluding interest and costs.

6.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because Defendant AmeriDoc resides in this district and all Defendants are residents of the state in which the district is located.  Further, venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district. Additionally, Plaintiff DocLogic is required by a forum selection clause to bring a suit arising under its Agreement with Defendant AmeriDoc in a state or federal court located in Collin County, Texas. (*See* "Agreement" attached as Exhibit A pp. 4-5)

## III. CONDITIONS PRECEDENT

7.      All conditions precedent have been performed or have occurred.

## IV. FACTS

8.     DocLogic, LLC is an Oregon limited liability company formed on August 10, 2011.   Its business is the White Label marketing of informational and telemedicine communications services to groups so that their members can contact a physician through a service agreement 24 hours a day for 365 days a year.  Certain medical advice is provided along with the writing of limited medicine prescriptions.  The groups with which DocLogic contracts pay a negotiated rate for the service, which can include a monthly service fee as well as fees for each use by a member.

9.     White Label marketing arrangements generally involve a product or service originally produced by one company that another company (the reseller) can rebrand and market under its own name to its own customers pursuant to a contract between producer and reseller.

10.    DocLogic contracted with AmeriDoc to provide White Label services.  DocLogic would make money based on the difference between its contractual rates with AmeriDoc and the revenues generated from the groups to which it remarkets the services.  Companies such as AmeriDoc profit through the increased utilization of their products or services.

11.    Dana Shaffer ("Shaffer") is the President of DocLogic, and has been since its formation.

12.    David Lindsey ("Lindsey") is the President of AmeriDoc.

13.    Ross Thompson ("Thompson") was the general counsel of AmeriDoc from at least 2011 through approximately the first half of 2014.

14.    Effective on or about August 12, 2011, DocLogic and AmeriDoc entered into the AmeriDoc & DocLogic Reseller Appointment Agreement ("Agreement").  (*See* "Agreement" attached as Exhibit A)

15.    The Agreement was the foundation of a White Label reseller relationship between

DocLogic and AmeriDoc.  In the Agreement, DocLogic was sometimes referred to as "Reseller," although AmeriDoc also stood in such capacity to AmeriDoc Physician Network, LLC.  Certain relevant excerpted portions of the Agreement are set forth below.

a.      "AMERIDOC is a provider of informational and telemedicine communications services and an authorized reseller of Member access to the telemedicine and informational services that are provided by the participating physicians in the AmeriDoc Physician Network (owned and operated by AmeriDoc Physician Network, LLC)[1] who have agreed to provide such services to AMERIDOC Members at negotiated contract rates, using the tools and telemedicine communication services provided by AMERIDOC."  (*See* "Agreement" p. 1)

b.      "Reseller[2] and AMERIDOC share the desire that Reseller be appointed to purchase and resell the AMERIDOC services to prospective clients, while branding Reseller to the prospective clients by ensuring that Reseller's chosen and AMERIDOC-approved brand, DocLogic, is prominent throughout the specially rebranded AMERIDOC services to be provided pursuant to this Agreement, as further explained below (the "White Label")."  (*See* "Agreement" p. 1)

c.      "AMERIDOC grants to Reseller the right to purchase and resell to prospective clients the AMERIDOC White Label services described in the Wholesale Pricing Schedule attached hereto as Exhibit "A" and to use in connection therewith, Reseller's Proprietary Marks, all pursuant to the terms and conditions of this Agreement. ... Reseller shall have the exclusive right to market said White Label services under DocLogic during the term of this Agreement. This right, however, does not restrict or prohibit AMERIDOC or its other resellers, producers, brokers and/or agents from marketing the same or similar services under AMERIDOC's brand and proprietary marks or the brand and proprietary marks of another."  (*See* "Agreement" p. 1, § I)

d.      "The term of this Agreement shall be seven (7) years[3] from the date hereof, and it shall automatically renew for additional seven (7) year periods unless either party gives the other written notice of intent not to renew, at least one hundred and twenty (120) days before the end of any current term."  (*See* "Agreement" p. 1, § II, A)

e.      "Either party may terminate this Agreement for cause by complying with the provisions herein.  Upon material breach of a party to this Agreement, the non-breaching party shall give written notice of such material breach to the breaching party.  The breaching party shall have thirty (30) days from the date of receipt of such notice to cure (within ten (10) days if the breach is C. 4. below).  If the breaching party does not cure such failure within the thirty (30) days (within ten (10) days if the breach is C. 4. below), the non-breaching party shall have the

---

[1] The Agreement acknowledged that AmeriDoc was a reseller for AmeriDoc Physician Network, LLC just as DocLogic is a reseller.

[2] As used in the Agreement, the term "Reseller" refers to DocLogic.

[3] The Agreement will not terminate by its own terms until August, 2018.

right to terminate this Agreement immediately.  If a party commits a breach of C.4. below more than twice in any six (6) month period, on the third breach the other party may terminate this Agreement immediately upon providing written notice to the breaching party.  Material breach of this Agreement includes:

      1.  any breach of the substantive terms of this Agreement;
      2.  any activity in violation of applicable laws and/or regulations;
      3.  forfeit by either party of applicable licenses;
      4.  either party has withheld, converted or failed to account for monies, funds, or other property belonging to or due to the other party;
      5.  either party acts, directly or indirectly through others, and such action injures the business and/or reputation of the other party; or
      6.  either party has directly, or indirectly through others, induced or attempted to induce employees, other resellers, producers, sub-producers, vendors or clients to terminate their relationship with the other party."  (*See* "Agreement" p. 1, § II, C)

    f.     "AMERIDOC will provide the White Label services pursuant to the terms and conditions of this Agreement and the Wholesale Pricing Schedule attached hereto as Exhibit "A"."  (*See* "Agreement" p. 2, § IV, A)

    g.     "AMERIDOC shall in its discretion maintain a continuing advisory relationship with Reseller, including consultation with respect to sales and marketing of the AMERIDOC services."  (*See* "Agreement" p. 2, § IV, B)

    h.     "AmeriDoc shall use uncompromising integrity in business transactions and agrees to use good business ethics, and not to misrepresent, misinform or deceive those with whom it transacts business."  (*See* "Agreement" p. 2, § IV, E)

    i.     "AmeriDoc will sell to Reseller at wholesale and allow Reseller to resell at retail the AMERIDOC services to employer groups only pursuant to the terms and conditions of this Agreement and the Wholesale Pricing Schedule attached hereto as Exhibit "A"."  (*See* "Agreement" p. 2, § IV, G)

    j.     "Reseller shall use its reasonable efforts to market the White Label services to prospective Clients.  Prior to initiating its marketing efforts, Reseller will obtain from AMERIDOC one set of all I (sic) pre-approved White Label group and/or member agreements, marketing and member enrollment materials, eligibility data forms, and fulfillment materials. Any additional copies will be made available at Reseller's expense.  AMERIDOC will maintain any and all resources and materials commercially reasonably required to deliver the White Label services pursuant to this Agreement, and reserves the right to update and revise these materials from time-to-time in its sole discretion and will provide Reseller commercially reasonable advance notice of and a set of all new revisions at no cost."  (*See* "Agreement" p. 3, § V, E)

    k.     "Reseller will purchase at wholesale and resell at retail the White Label services to employer groups only pursuant to the terms and conditions of this Agreement and the Wholesale Pricing Schedule attached hereto as Exhibit "A"."  (*See* "Agreement" p. 3, § V, F)

l.      Upon termination "Reseller shall immediately turn over to AMERIDOC or destroy all AMERIDOC marketing materials, manuals, proprietary and confidential materials (all of which are acknowledged to be AMERIDOC's property), and shall retain no copy or record of any of the foregoing, excepting only Reseller's copy of this Agreement and copies of any correspondence pertaining thereto between AMERIDOC and Reseller, and any documents which Reseller reasonably needs for compliance with any provision of law.  AMERIDOC shall immediately destroy all White Label marketing materials, manuals, proprietary and confidential materials (all of which are acknowledged to be only usable by AMERIDOC pursuant to this Agreement), and shall retain no copy or record of any of the foregoing, excepting only AMERIDOC's copy of this Agreement and copies of any correspondence pertaining thereto between AMERIDOC and Reseller, and any documents which AMERIDOC reasonably needs for compliance with any provision of law." (*See* "Agreement" p. 4, § VI, 4)

m.      "AMERIDOC hereby acknowledges and agrees that all clients using the White Label service pursuant to this Agreement are the clients of Reseller, and agrees to provide such data as may be commercially reasonably required at Reseller's expense to aid in the transition of all clients from AMERIDOC to whichever HIPAA compliant partner Reseller shall designate, including by ensuring full client access to all client information gathered during provision of the White Label services." (*See* "Agreement" p. 4, § VI, 5.)

n.      "This Agreement shall be interpreted and construed under the laws of the state of appropriate venue for any dispute arising hereunder, notwithstanding its choice of laws provisions.  If AMERIDOC brings any complaint, files any suit, or otherwise commences any legal action under this Agreement, exclusive venue of any proceeding arising from or interpreting this Agreement shall be in a state or federal court located in Washington County, Oregon (and any objection to lack of personal jurisdiction in that venue is waived).  If Reseller brings any complaint, files any suit, or otherwise commences any legal action under this Agreement, exclusive venue of any proceeding arising from or interpreting this Agreement shall be in a state or federal court located in Collin County, Texas (and any objection to lack of personal jurisdiction in that venue is waived)." (*See* "Agreement" p. 4-5, § IX)

o.      "Any controversy or dispute arising out of, or relating to, this Agreement, or any modification or extension thereof, shall be submitted to non-binding mediation before a mediator in the applicable venue pursuant to Article IX, agreed upon by AMERIDOC and Reseller.  If no mediator can be agreed upon, each party will select a mediator and the two mediators will select a third mediator to mediate the matter.  The mediator's fee shall be borne equally by AMERIDOC and Reseller.  Submission to non-binding mediation shall be a prerequisite to the institution of any legal proceeding regarding the controversy or dispute.  No lawsuit may be filed unless and until the mediator declares, in writing, that the parties participated in mediation in good faith to resolve their differences, however, mediation was unsuccessful." (*See* "Agreement" p. 5, § X)

16.     When the Agreement was executed, there was also signed as of the same date, August 12, 2011, an "Exhibit A Wholesale Pricing Schedule" that was attached to the

Agreement.  It included various pricing and service models referred to as the "Option A Product," "Option B Product," "Option C Product" and "Option D Product."  The Option D Product was an exclusive offering made available only to DocLogic.

17.     The August 12, 2011, documents were accompanied by the "Addendum No. 1 to AmeriDoc and DocLogic Reseller Appointment Agreement" ("Addendum 1").  (*See* "Addendum 1" attached as Exhibit B)

 The Addendum further explained the rights of the parties regarding the White Label services.

a.      "It is envisioned that the White Label "DocLogic - AmeriDoc Program" will be a collaborative effort between the parties hereto enabling DocLogic to market on its web site (and through other media) its products and services, which will include DocLogic member access to the services offered by AmeriDoc, LLC to be branded under the DocLogic private label trade name.  The White Label services provided by AmeriDoc Physician Network, LLC will be clearly branded under the DocLogic brand."  (*See* "Addendum 1" p. 1)

b.      "The Parties also agree that DocLogic remains the exclusive owner of all DocLogic references and Member contact information, and that each member retains ownership of their individual information, including all PHI."  (*See* "Addendum 1" p. 1)

c.      "AmeriDoc agrees that during the initial term of the Agreement and any renewal period:  1) Reseller shall be afforded the exclusive rights to market the Option D product from the Agreement to and/or through third party administrators; and 2) AmeriDoc will not offer to or support the marketing of the Option D product from the Agreement (or any similar no PMPM telemedicine product) to and/or through third party administrators."  (*See* "Addendum 1" p. 2)

d.      "In recognition of, and to protect the legitimate business interests of Reseller in its Member base, creative services structuring, confidential information, specialized training and goodwill, which it will share with AmeriDoc during the term of the Agreement, AmeriDoc agrees that during the initial term of the Agreement, any renewal period, and for a two (2) year period following its termination (unless Reseller refuses to renew the Agreement pursuant to renewal terms of the Agreement or AmeriDoc justifiably terminates the Agreement for cause), AmeriDoc and its subsidiaries and affiliates, will not solicit, purchase, market or resell informational and telemedicine communications services or access to informational and diagnostic consultation services of or to any Member or third-party administrator served under the White Label Services pursuant to the Agreement; or solicit, hire, or attempt to hire any person who is employed by Reseller or its affiliates or otherwise induce or encourage employees of Reseller or its affiliates to terminate their employment with Reseller."  (*See* "Addendum 1" p. 2)

e.      A development and integration fee was required to be paid to AmeriDoc, which

was to be paid in two installments of $7,500.00 each.  (*See* "Addendum 1" p. 2)

      f.    AmeriDoc was entitled to receive, effective with the month of March, 2012, a minimum monthly payment of $1,500.00 in the event that the sum calculated in accordance with the contract documents executed by DocLogic and AmeriDoc based on membership and usage was less than $1,500.00.  (*See* "Addendum 1" p. 2)

      18.    On or about August 15, 2011, AmeriDoc was paid $7,500.00 as part of the development and integration fee described in Addendum 1.  A second installment was paid on or about October 17, 2011, which satisfied the balance of the $15,000 described in Addendum 1.

      19.    AmeriDoc and DocLogic executed an "Amended Exhibit A Wholesale Pricing Schedule" ("Amended Exhibit A") on or about November 10, 2011.  That document replaced the original Exhibit A document dated August 12, 2011 and made certain price adjustments.

      20.    AmeriDoc and DocLogic executed a "Supplement to Amended Exhibit A Wholesale Pricing Schedule" on or about March 7, 2012.  That document stated that it was a supplement to the Amended Exhibit A dated November 10, 2011 to the August 12, 2011 Agreement, and it modified the Option C product as well as defined a fulfillment welcome letter arrangement.

      21.    For March, April and May of 2012, Lindsey at AmeriDoc agreed to waive the $1,500.00 minimum monthly payments while DocLogic was in the process of building its Member base during that period.  Instead of making the minimum payments, which would be applicable if the normally calculated billing were less, DocLogic was able to pay the calculated amount.  The postponement of the minimum fee was agreed to run through May, and the minimum fee would become applicable for the June service month.

      22.    AmeriDoc and DocLogic executed a "Second Supplement/Amendment to Amended Exhibit A Wholesale Pricing Schedule" on or about June 4, 2012.  That document stated that it was a supplement and amendment to the March 7, 2012 previously executed

supplement and the Amended Exhibit A dated November 10, 2011 to the August 12, 2011 Agreement.  It modified the Option B Product and further defined a fulfillment welcome letter arrangement.

23.     During the months of March, April and May of 2012, as the relationship between DocLogic and AmeriDoc progressed, AmeriDoc invoiced DocLogic for monthly fees, but did so with the omission of a minimum fee amount applicable if the actual billing for a particular period were less than such minimum.  DocLogic paid the calculated sums based on membership, but not the $1,500.00.  AmeriDoc continued to invoice DocLogic for the lesser sum for several months beyond May.

24.     On September 18, 2012, AmeriDoc's General Counsel, Thompson, contacted DocLogic by email.  He said that AmeriDoc had only invoiced DocLogic for its "actual" member count and not the minimum payment of $1,500.00, which he said resulted in an underpayment.  He asked for payment of $9,000.00 to cover the six months from the beginning of March through August of 2012.

25.     On September 28, 2012, Marie Conser of DocLogic responded to Thompson and reminded him of the agreement between Lindsey and Shaffer regarding the postponement of the application of the monthly minimum payment from March to June, 2012.  DocLogic paid $6,000.00 to AmeriDoc for May, June, July and August.  That payment was excessive, as it resulted in an overpayment for May, 2012.  AmeriDoc accepted the payment.  The parties continued to operate under the Agreement.  AmeriDoc gave no further notice of an alleged breach and did not terminate the Agreement.

26.     DocLogic continued its efforts to expand its group customer base in reliance on the Agreement with AmeriDoc.

27.    The Agreement with AmeriDoc provided, among other things, that "AmeriDoc shall use uncompromising integrity in business transactions and agrees to use good business ethics, and not to misrepresent, misinform or deceive those with whom it transacts business." AmeriDoc was aware through Lindsey and Thompson that DocLogic had relied on Lindsey's agreement in behalf of AmeriDoc to postpone the application of the $1,500.00 minimum monthly fee.  DocLogic did precisely what the Agreement required it to do, which was to "use its reasonable efforts to market the White Label services to prospective Clients."  Both parties benefited from DocLogic's continued performance under the Agreement.[4]  Subsequently, two years later, AmeriDoc will use the allegedly deficient and late minimum payments as its basis for terminating the Agreement.[5]

28.    AmeriDoc continued to provide services to DocLogic; DocLogic continued to pay for the services and market them.  The parties at multiple times modified the Agreement.

29.    AmeriDoc and DocLogic executed a "Third Supplement/Amendment to Amended Exhibit A Wholesale Pricing Schedule" on or about November 29, 2012.  That document stated that it was a supplement and amendment to the June 4, 2012 and March 7, 2012 previously executed supplements and the Amended Exhibit A dated November 10, 2011 to the August 12, 2011 Agreement.  It provided for the creation of new Option E and Option F Product and further

---

[4] By the time that AmeriDoc notified DocLogic of its termination of the Agreement, DocLogic had a membership base of over 12,000 persons in May, 2014.

[5] AmeriDoc cannot predicate a contract termination on a late or deficient payment of the minimum monthly amounts for periods during which it had agreed to forgo such amounts, subsequently accept allegedly late payments, cause DocLogic to continue to purchase AmeriDoc services and to expend efforts to enhance the DocLogic brand and membership base for two more years and then announce that the Agreement was terminated because DocLogic did not get a signed waiver document, without violating the duty and express warranty to "use uncompromising integrity in business transactions and agrees to use good business ethics, and not to misrepresent, misinform or deceive those with whom it transacts business." Unfortunately, AmeriDoc will do precisely that on May 23, 2014.

defined an associated fulfillment welcome letter arrangement and pricing structure.

30.     AmeriDoc and DocLogic executed a "Fourth Supplement/Amendment to Amended Exhibit A Wholesale Pricing Schedule" on or about December 12, 2013.  That document stated that it was a supplement and amendment to the November 29, 2012, June 4, 2012 and March 7, 2012 previously executed supplements and the Amended Exhibit A dated November 10, 2011 to the August 12, 2011 Agreement.  It provided for a Member fulfillment letter arrangement and pricing structure.

31.     In the beginning of the relationship between DocLogic and AmeriDoc, the AmeriDoc doctors were not credentialed with certain insurance companies.  For the DocLogic and AmeriDoc arrangement to be as successful as possible, it would be important for such credentialing to be arranged.  In March 2014, Shaffer and AmeriDoc's General Counsel Thompson began cooperating to get the AmeriDoc Physician Network approved by Regence Blue Cross/Blue Shield, a major insurance company, as part of an effort to meet the requirements necessary for DocLogic to provide telemedicine services for the USI/Kibble & Prentice Health Connect Private Exchange.  By April, 2014, it was apparent that AmeriDoc doctors were in the process of becoming credentialed and approved by Regence Blue Cross/Blue Shield, under their Credentialing Delegation Program.

32.     As Shaffer continued to market DocLogic, he was able to establish a business relationship with USI NW, which was a very desirable contact.  In 2013, Shaffer worked with Rico Bocala of USI.  Among the companies USI was considering for its network were DocLogic and Teladoc.  On February 26, 2014, Rico Bocala met with and informed Shaffer that DocLogic was selected to be the telemedicine provider for the Private Exchange and that Regence Blue Cross/Blue Shield will be the health plan.  What remained for discussion over the next few

weeks would be the details of implementation and launch.  On March 11, Rico Bocala sent an email announcement of the companies selected for the USI NW Private Exchange.  The selected companies were Communication Partners (BenefitElect) – benefit/administration system, Regence Blue Cross/Blue Shield – group medical, LifeMap – group life, DI, voluntary products (life, AD&D, DI, critical illness, vision and dental), DocLogic – telemedicine, and Allegiance – FSA.

33.     On March 19, 2014, Shaffer and Conser had discussions with Regence Blue Cross/Blue Shield regarding claim forms and administrative issues.  They discussed the format of the eligibility and claims forms, the information required on the claim forms, the use of a third party clearing house to process claims and the Regence process for handling telemedicine claims. Later that afternoon, Shaffer and Conser called Thompson to discuss the meeting with Regence. On March 25 Thompson was contacted again to discuss the eligibility and claims process. Additional discussions with Thompson followed concerning the credentialing of AmeriDoc physicians with Regence, physician network management, AmeriDoc credentialing methods and to make sure that AmeriDoc had sufficient participating physicians.

34.     Over the next five weeks, DocLogic worked extensively with Ross Thompson and other members of the AmeriDoc team to get the doctors in the AmeriDoc Physician Network credentialed under the Regence Blue Cross/Blue Shield Credentialing Delegation Program, to work through details concerning the eligibility and claims process and to insure that both companies met all of the requirements necessary to work with Regence.

35.     Shaffer was unaware of changes transpiring at AmeriDoc.  AmeriDoc would soon terminate the Agreement.  On April 26, 2014, a Saturday, AmeriDoc General Counsel Thompson called Shaffer and told him that Lindsey wanted to eliminate the Option D product offering.

Option D was a product pricing model that DocLogic had the exclusive contractual right to sell. DocLogic had never sold this product but had engaged in numerous discussions with prospective clients who were interested in the product.   Shaffer was unaware of any acquisition plans involving AmeriDoc and Teladoc at that time.   In the interest of being cooperative, Shaffer agreed to terminate the Option D product.

36.   On the next day, Sunday, April 27, Thompson emailed Shaffer a "Second Amended Exhibit A," which deleted Option D.  Shaffer was asked to sign the document and email it back to Thompson.

37.   The "Second Amended Exhibit A" was titled "Second Amended Exhibit A; Amended Supplement to Amended Exhibit A; Amended Second Supplement/Amendment to Amended Exhibit A; Amended Third Supplement/Amendment to Amended Exhibit A; and Amended Fourth Supplement/Amendment to Amended Exhibit A; Wholesale Pricing Schedule." (*See* "Second Amended Exhibit A" attached as Exhibit C)  That document stated that it amended the previous supplements and amendments, including the December 12, 2013, November 29, 2012, June 4, 2012 and March 7, 2012 previously executed supplements and the Amended Exhibit A dated November 10, 2011 to the August 12, 2011 Agreement.  It provided for the deletion from the original Amended Exhibit A of the Option D Product.

38.   On Monday, April 28, Shaffer and Thompson emailed to each other the executed "Second Amended Exhibit A" document.  (*See* Exhibit C, the "Second Amended Exhibit A.") Later in the day, at approximately 5:10 pm PDT, Lindsey and Thompson called Shaffer on his cell phone.  They falsely told him that they had investors that wanted to invest in AmeriDoc. Lindsey said that the investors are insisting that Shaffer agree to shorten the length of the remaining term of the DocLogic Agreement with AmeriDoc.  They wanted the Agreement to be

terminated as of December 31, 2015, which was highly unusual considering that earlier in the same day there had been an execution of the "Second Amended Exhibit A."  Shaffer said that he could not do that as DocLogic had investors of its own that have invested in DocLogic relying in part on the length of the Agreement with AmeriDoc.  In order to continue revenue growth, DocLogic would need AmeriDoc to perform as promised for the full term of the Agreement. Shaffer reminded Lindsey about the new client, USI, and the importance of the opportunity.  If successful in the Northwest, USI had discussed making the solution a national program.  Shaffer also told Lindsey that DocLogic had some substantial benefit brokers who would be signing up with DocLogic that would bring more clients by the end of the year.  Lindsey said that DocLogic efforts had not yielded the results he had anticipated.  Shaffer reminded him that he had encountered difficulty when one of the DocLogic staff involved in business development and sales left and was in turn hired by AmeriDoc.  That person, Derek McCullough, assisted AmeriDoc in competing with DocLogic using business contacts he had developed working with DocLogic.  Lindsey became upset and told Shaffer that he had to get this done.  Lindsey said that he did favors for Shaffer in the beginning of the relationship between their respective companies. Lindsey said he had waived three months of monthly service fees in early 2012 and only charged a small amount to create the White Label platform for DocLogic.[6]  Lindsey said that he was Shaffer's friend and that he had always supported him.  Lindsey expected an answer from Shaffer regarding the shortening of the term of the Agreement by the next day.  Shaffer said that he would have to communicate with investors as well as legal counsel, and he could not commit to a time to give Lindsey a response.  Lindsey said that getting attorneys involved would make things messy.  Shaffer reminded him of his own "sweat equity" invested in DocLogic.  Lindsey

---

[6] DocLogic paid AmeriDoc $15,000 for this work.

said that things would get ugly for Shaffer if he would not agree to shorten the deal.  Lindsey offered Shaffer $10,000 to take the deal.  The call lasted for a little less than an hour.

39.     On Tuesday, April 29, 2014, Thompson called and he spoke for nearly an hour with Shaffer about shortening the remaining term of the Agreement.   At the end of the conversation, Thompson revealed that Lindsey was not really negotiating with investors but with a buyer, Teladoc.

40.     Later, on April 29, Lindsey and Thompson called Shaffer on his cell phone and confirmed that, in fact, AmeriDoc was being acquired by Teladoc.  Lindsey said that Teladoc was pressuring him to shorten the length of the DocLogic Agreement so that it would expire on December 31, 2015.  Shaffer would not agree.  DocLogic had obligations of its own to investors and Shaffer had invested two years and eight months developing the company pursuant to and in reliance on the terms of the existing Agreement.  Shaffer said that his efforts with DocLogic were about to pay off and he reminded Lindsey that the USI deal was only several weeks away from launch and that it should benefit AmeriDoc's Physician Network as well as DocLogic. AmeriDoc doctors were becoming credentialed and approved by Regence Blue Cross/Blue Shield, which was advantageous as well.  Lindsey said that if Shaffer did not agree to this shortened deal that Teladoc would find a way to terminate the Agreement.  Further, even if Shaffer could get Teladoc to provide a White Label solution, which it supposedly had never done, DocLogic would not get the kind of service that it needed to serve its clients.  DocLogic customers would feel the pain.  Lindsey suggested that calls might not get returned and issues might not get resolved in a timely manner.  Lindsey also told Shaffer that Teladoc executives are not nice people and that they have one of the most powerful law firms in Dallas.  Lindsey suggested that Teladoc would be willing to pay $10,000, and then Lindsey raised the number to

$25,000 for a promise to terminate the Agreement early.  If he were Shaffer, Lindsey said, he would take the money and find another company to work with as soon as possible.  Lindsey suggested MDLive and offered to call them on Shaffer's behalf.  Shaffer explained to Lindsey that the Agreement between DocLogic and AmeriDoc was for seven years and that DocLogic needed every month of the remaining term of the Agreement to make good on its obligations to investors and Shaffer expected AmeriDoc or Teladoc to honor the Agreement.  Lindsey again became upset.  Lindsey wanted to know who the DocLogic investors were and if he could come to Portland, Oregon to meet with them.  Lindsey reminded Shaffer that in the beginning of the business relationship, his company did favors for DocLogic such as waiving the first few months of monthly minimum service fees.  As before, Shaffer would not agree to an early termination of the Agreement by DocLogic.

41.     The next day, Lindsey called Shaffer when he was in a meeting with one of the DocLogic investors, David Pyle.  Lindsey reiterated the $25,000 offer for an early termination of the Agreement.  They discussed the USI transaction and associated logistics.  Lindsey knew that AmeriDoc had no legal right to terminate the Agreement or he would not have offered to pay money to achieve an early termination.

42.     On May 1, 2014, Thompson called and confirmed the early termination offer from Teladoc was for $25,000, that the deal would require that the term of the Agreement would end on December 31, 2015.  After that termination date, the Agreement might be renewable for one-year periods, provided that Teladoc could raise the pricing at its discretion.  Shaffer said that such an arrangement would not work for DocLogic, its investors or customers.  Raising the wholesale prices would have a negative impact on DocLogic's ability to price services competitively.

43.     The next day, May 1, Lindsey called Shaffer and told him that the acquisition was expected to go through that day and that Teladoc had decided not to do anything about the DocLogic contract at that time.

44.     Believing that the Teladoc acquisition would not adversely impact his business relationship, Shaffer asked Lindsey on May 5 if he could notify USI that Teladoc has acquired AmeriDoc, as such event would have some impact on the implementation process particularly as it related to physician credentialing.  Lindsey agreed that Shaffer should discuss the matter with USI.  Shaffer attempted to reach Rico Bocala of USI by phone and email.  Shaffer sent an email communication to Mike King (Chief Sales Officer at Teladoc) to introduce the USI project as well as himself, and to find out who his points of contact would be at Teladoc.

45.     On May 6, 2014, Shaffer continued his efforts regarding USI NW.  He spoke to its President, Rico Bocala, and told him about Teladoc's acquisition of AmeriDoc.  Shaffer knew that the Teladoc acquisition might impact the USI NW deal and wanted to keep Rico Bocala informed.

46.     On May 7, 2014, Shaffer and Marie Conser spoke to Lindsey and Teladoc representatives Joanie Tardie and Kathy Russell for approximately an hour.  It was the first contact between DocLogic and Teladoc.  Shaffer went over the terms of the White Label Agreement.  DocLogic owned the rights to its customers and that all telemedicine services delivered to its customers are delivered under the DocLogic brand name on a DocLogic branded platform with DocLogic Customer Service and DocLogic branded marketing materials.  Shaffer told them that he would expect to deliver all future telemedicine services to DocLogic customers (including USI) on either the AmeriDoc existing platform or a DocLogic branded version of the Teladoc platform, assuming it was an acceptable platform.

47.     Shaffer confirmed by email after the telephone call with Lindsey, Tardie and Russell what his concerns and priorities were.  Shaffer explained the status of the pending agreement with USI to deliver telemedicine services to the USI/Kibble & Prentice Health Connect Exchange and the Northwest Student Health Insurance Consortium, which was expected to become operational on June 1, 2014.  Shaffer laid out the issues and components of the implementation of the USI project, including member eligibility processing, physician credentialing and how the AmeriDoc physician network credentialing was nearly complete.  Shaffer was concerned about a statement by Lindsey, which was that the AmeriDoc Physician Network no longer existed; however, since the Teladoc network should already have been vetted with Regence Blue Cross/Blue Shield, the solution appeared to be to inform Regence that DocLogic would be using the Teladoc network.  Shaffer also explained the need to use a DocLogic-branded platform.  From the time members activate their membership to the time they request a consultation, complete their health records and consult with a physician, the members should remain entirely in a DocLogic environment and not an AmeriDoc branded environment.

48.     Shaffer further explained that DocLogic had a total of approximately 12,577 members (6,913 memberships) across 20 groups.  They were all serviced by AmeriDoc under the White Label Agreement.  Moreover, DocLogic had confirmed renewals for the summer and had other prospective clients and brokers in the process of finalizing the terms of their agreements with DocLogic.  Shaffer reiterated that all of the DocLogic clients were, in fact, its clients, and that all client management was through DocLogic.  He understood that Teladoc would facilitate the transitioning of the DocLogic clients into its platform consistently with its Agreement with AmeriDoc.  Shaffer reminded Lindsey, and told the Teladoc representatives, that the Agreement with DocLogic did not terminate until August, 2018.

49.     During the May 7, 2014, telephone call, Shaffer was told by Lindsey that he could tell Regence Blue Cross/Blue Shield about Teladoc's acquisition of AmeriDoc, so Shaffer contacted Csaba Mera and Hattie Clabby at Regence to deliver the news.  Shaffer told both of them that it appeared that DocLogic would be moving from AmeriDoc's physician network to Teladoc's physician network as Teladoc was folding AmeriDoc's network into its own.

50.     On May 8, the day after Shaffer spoke to Lindsey, Tardie and Russell, and described the structure of the DocLogic membership, AmeriDoc and Teladoc sent out a joint email letter to DocLogic's clients and members notifying them that AmeriDoc had merged with Teladoc and that as AmeriDoc members they would now receive telehealth services from their new telehealth provider, Teladoc.  Of course, this was a very damaging to DocLogic as all telemedicine services delivered to DocLogic customers are delivered under the DocLogic brand name on a DocLogic branded platform with DocLogic Customer Service and DocLogic branded marketing materials.  With one or two exceptions, wherein DocLogic has, by its own choice, disclosed DocLogic's relationship with AmeriDoc (USI/Regence), DocLogic's clients are unaware that DocLogic resells the AmeriDoc White Label services.  After the communication went out, DocLogic received numerous emails and phone calls from its clients questioning why they received the email when DocLogic managed their telehealth services.  Only one day had elapsed after the DocLogic conference call with Teladoc and AmeriDoc in which Shaffer reiterated the importance of maintaining the DocLogic brand for its clients' services and asked about the timing of a DocLogic branded version of the Teladoc platform.

51.     The next day, May 9, DocLogic staff continued to respond to emails and phone calls from clients and brokers regarding the Teladoc/AmeriDoc email letter.  At 1:00 p.m., Shaffer met with Rico Bocala of USI, and they discussed the timing of the implementation of the

pending Northwest Student Consortium launch scheduled for June 1 and the subsequent launch

of the USI/ Kibble & Prentice Health Connect Exchange scheduled for July 1.

52.     Also on May 9, 2014, Teladoc issued a press release describing its growth and

expanded reach to more customers.  It said:

> Teladoc Acquires AmeriDoc, Expands Service Offerings and Member Base
>
> *Acquisition broadens Teladoc's reach to provide services to new market segments.*
>
> (DALLAS, Texas) May 9, 2014 – Teladoc, the nation's first and largest telehealth provider with more than 7.5 million members, announced today the acquisition of AmeriDoc, a telehealth company founded in 2007.  This acquisition supports Teladoc's strategy for growth into new and fast-growing market segments.
>
> "The positive impact of telehealth on our health care system has fueled rapid adoption across all market segments," said Jason Gorevic, Teladoc's CEO.  "With this acquisition, Teladoc will accelerate the reach of its services to a larger base of clients, partners and patients and extend its leadership position in the exploding telehealth arena."
>
> Through Teladoc, patients consult with a physician via phone or secure online video to receive treatment for non-emergency medical issues, such as allergies, bronchitis, pink eye and sinus problems.  Teladoc physicians complete more than 250,000 consults annually, have an average of 15 years experience and score a 95 percent patient satisfaction rate.  Teladoc is also the first and only telehealth company to be certified by the National Committee for Quality Assurance (NCQA).  This certification demonstrates the highest commitment to quality health care.

53.     Teladoc was in the process of consolidating its acquisition of the AmeriDoc client

base.  Teladoc would soon force DocLogic out of its own customer relationships as part of the

process.

54.     On May 13, 2014, Shaffer followed up with Tardie at 11:45 am PDT inquiring on

the progress Teladoc had made on the execution of agenda items they discussed on May 7

relating to the delivery of telemedicine services to the USI/Kibble & Prentice Health Connect

Exchange and the Northwest Student Health Insurance Consortium.  Tardie told him that she had

no update but that Teladoc was working on it and she would respond more fully later.  DocLogic continued to have to respond to emails and calls concerning the Teladoc/AmeriDoc email letter that went out on May 8.

55.     On May 14, 2014, Tardie told Shaffer that Teladoc will be moving the USI Exchange and Student Consortium to Teladoc.  Tardie said that Regence told Teladoc that they should start working on the USI project with Teladoc, and that Shaffer had authorized it. (Shaffer had not consented.)  Everything would be labeled Teladoc.  Standard Teladoc Welcome Kits would be sent out.  Members would access the Teladoc website.  Shaffer told Tardie that USI is a DocLogic client that needs to be serviced by DocLogic per its agreement with USI. That meant through the use of a DocLogic-branded platform, DocLogic Customer Service and DocLogic marketing.  Every aspect of the implementation should use the DocLogic brand.  The USI relationship was extremely important to DocLogic, as it was a client with significant stature. Lindsey, also on the telephone call, said that DocLogic was going to lose its branding, service and everything else.   Lindsey reminded Shaffer about how, back in the beginning of the relationship, AmeriDoc "floated" DocLogic for several months, a reference to the delayed implementation of the minimum monthly service fee.  The conversation ended with Shaffer telling Lindsey and Tardie that USI is a DocLogic client and he expected Teladoc and AmeriDoc to honor the Agreement.

56.     On May 16, 2014, Shaffer communicated with Rico Bocala to tell him what appeared to be happening with Teladoc.  Shaffer explained that as the new owner of AmeriDoc, Teladoc will be moving the USI Exchange and Northwest Student Consortium to Teladoc, which should be with DocLogic branding.

57.     Shaffer, who was running out of time to finish the USI arrangements, followed up

again with Tardie on May 19.  Shaffer said that he needed to confirm what Teladoc would do regarding the provision of telemedicine services for DocLogic's client, USI, in connection with the USI/Kibble & Prentice Health Connect Exchange and the Northwest Student Healthcare Consortium.  Shaffer reminded Tardie that USI was a DocLogic customer and reiterated the rights of DocLogic under the White Label Agreement.  Tardie provided no helpful confirmation.

58.     Shaffer tried again to find out what was going on the next day, May 20, and he got no response.

59.     On May 21, Shaffer was surprised to receive at his office copies of Welcome Letters that had been sent out to members of a new DocLogic client, Precision Steele in Ohio, with AmeriDoc branding on the envelop and letter.   There was no mention of DocLogic. Teladoc and AmeriDoc were directly contacting DocLogic customers in a manner violating the Agreement.

60.     The next day, May 22, Shaffer had a discussion with Rico Bocala at USI.  The information Shaffer received from Rico Bocala helped him understand the lack of communication from Teladoc.  Shaffer was told that Teladoc had sent in its own proposal to him on May 19, 2014, matching the DocLogic pricing.  It was done in spite of conference calls in which Shaffer, Lindsey and Teladoc personnel discussed DocLogic plans and rights under the White Label Agreement.  Moreover, Lindsey and Teladoc undermined DocLogic without telling Shaffer what they were doing despite Shaffer's attempts to contact them to find out how implementation of a Teladoc platform for DocLogic was proceeding.  Further, Shaffer was told by Rico Bocala that Teladoc told him he should query Shaffer on the status of the DocLogic relationship with Teladoc.  The Teladoc communications with Rico Bocala created doubt as to whether DocLogic had a working relationship with Teladoc and could use their network and

physicians.  The viable alternative before Rico Bocala then became MDLive.

61.     Finally, on May 23, 2014, Shaffer received a letter that communicated more directly and openly.  The Agreement was terminated.  A letter from Teladoc SVP and General Counsel, Thomas Seaman, made the announcement.   The latter said that Teladoc was the successor in interest to AmeriDoc.  The justification for the termination recited in the letter was that DocLogic had not paid certain fees under the Agreements, which were those same fees actually paid and accepted in 2011 and 2012, two years or more in the past.  No other breach event was alleged.  "Accordingly, you are hereby notified of such breaches and, pursuant to the last sentence of Section II(C) of the Agreement, the Agreement is hereby terminated immediately."  (*See* Exhibit D, the "Termination Letter")  The Teladoc letter suggested that "[a]s a courtesy that may be discontinued at any time at the sole option of Teladoc and without notice to DocLogic, and not giving rise to any obligation or commitment whatsoever, Teladoc will continue to provide service for a period of time in the event DocLogic wishes to discuss a transition of its business or other accommodation with Teladoc."  The offer of continued service was of little consolation, considering the acts of AmeriDoc and Teladoc in relation to the DocLogic members.

62.     On June 5, Rico Bocala, the USI President, said that he had selected MDLive to be the telehealth vendor for the Private Exchange and the Northwest Student Consortium. DocLogic had officially lost USI.  That same day, Elizabeth Whitehead at AmeriDoc emailed DocLogic to notify it that due to AmeriDoc's recent merger with Teladoc, the next month's invoice would be coming from Teladoc.

63.     Consistently with the Agreement, and despite the fact that it had been terminated, DocLogic proposed the name of a mediator that could mediate the dispute in Collin County,

Texas.   Rather than to accept the suggested mediator proposed by DocLogic or select another mediator of its own so that the two candidates could then select a mediator, AmeriDoc told DocLogic to produce the names of three mediators.   Neither AmeriDoc nor Teladoc complied with the terms of the Agreement.   Teladoc had already announced that the Agreement was terminated.   Teladoc legal counsel responded on behalf of AmeriDoc and stated that Teladoc was the successor in interest to the Agreement between DocLogic and AmeriDoc.

64.     DocLogic has less than $25,000,000.00 in assets and is not owned or controlled by a corporation or entity with assets of $25 million or more.

65.     This dispute is governed by the law of the state of Texas.

## V.  CAUSES OF ACTION

### BREACH OF CONTRACT

66.     DocLogic incorporates the factual allegations of paragraphs 1-65 fully herein.

67.     AmeriDoc is in breach of its contract with DocLogic.   Teladoc, as its successor in interest is also in breach of such contract.   There existed a valid contractual relationship between the parties.   It provided for DocLogic to be a reseller of telemedicine services under the Agreement as amended and supplemented and it was to last for seven years.   The Defendants breached the contract by terminating same prematurely and without any defense.   The contract was in writing.   DocLogic performed according to the term of the contract or its nonperformance, if any, was waived.   DocLogic has suffered damages and will continue to do so, which include loss of revenue, loss of goodwill, loss of clients and increased costs of finding replacements services if it can be done.

68.     The May 23, 2014 letter announcing the termination of the Agreement stated that the termination was the result of an alleged breach by DocLogic of a payment obligation.   The letter identified Section II (C)(4) of the Agreement as the basis for the termination.   The

Agreement provided that if "either party has withheld, converted or failed to account for monies, funds, or other property belonging to or due to the other party" "more than twice in any six (6) month period, on the third breach the other party may terminate this Agreement immediately upon providing written notice to the breaching party."

69.     Lindsey had agreed to waive the minimum payment for March, April and May of 2012.  Despite such waiver, if AmeriDoc were to terminate the Agreement based on such alleged breach, it had to do so immediately.   Although the term "immediately" is not defined in the Agreement, for AmeriDoc and Teladoc to terminate the Agreement based on events of two years ago established their own breach of contract.   Moreover, despite the AmeriDoc and Teladoc position that DocLogic committed a string of material breaches, such position does not reconcile with the continued acceptance of payments from DocLogic, continued provision of services, execution of multiple amendments and supplements to the Agreement and eventual offer of money to terminate it early.  Clearly, the May 23, 2014 letter demonstrates the use of pretext as a basis for termination.[7]

70.     As part of the Agreement, AmeriDoc acknowledged and agreed that all clients using the White Label service pursuant to the Agreement were the clients of Reseller (DocLogic).   To protect the legitimate business interests of DocLogic in its "Member base, creative services structuring, confidential information, specialized training and goodwill, which it will share with AmeriDoc during the term of the Agreement, AmeriDoc agrees that during the initial term of the Agreement, any renewal period, and for a two (2) year period following its termination (unless Reseller refuses to renew the Agreement pursuant to renewal terms of the Agreement or AmeriDoc justifiably terminates the Agreement for cause), AmeriDoc and its

---

[7] The May 23, 2014 termination letter followed the April 28, 2014 amendment by only 25 days.

subsidiaries and affiliates, will not solicit, purchase, market or resell informational and telemedicine communications services or access to informational and diagnostic consultation services of or to any Member or third-party administrator served under the White Label Services pursuant to the Agreement."  AmeriDoc and its affiliated entity, Teladoc have breached the contract by soliciting the customers and members of DocLogic though their direct contact with them.

71.    The Agreement required the parties to mediate disputes arising out of the Agreement.  DocLogic suggested a mediator, as it was required to do.  AmeriDoc and Teladoc did not agree to the DocLogic proposal.  AmeriDoc and Teladoc should have suggested their own proposed mediator so that the two mediators would then select a third to serve in such capacity, but AmeriDoc and Teladoc did not do so, which was a breach of the Agreement.

72.    In addition to its actual damages, DocLogic seeks attorney fees.

BREACH OF WARRANTY

73.    DocLogic incorporates the factual allegations of paragraphs 1-72.

74.    AmeriDoc has breached an express warranty as part of a contract for the sale of services.  The Agreement stated that "AmeriDoc shall use uncompromising integrity in business transactions and agrees to use good business ethics, and not to misrepresent, misinform or deceive those with whom it transacts business."  AmeriDoc misrepresented its intentions with regard to the agreement to postpone the application of the $1,500.00 minimum payment and the waiver of other delays in payment occasioned by invoice errors of its own.  AmeriDoc chose to hide its intentions and then spring its allegation of default on DocLogic at a time of its choosing and convenience.  Moreover, it waited until the efforts of DocLogic had paid off with successful client development so effective that DocLogic successfully was competing with Teladoc.  Also,

AmeriDoc general counsel, Thompson, and Lindsey caused it to enter into a contract amendment on April 28, 2014, while at the same time they were planning for the termination of the arrangement.

75.     AmeriDoc has based the contract termination excuse on a late or deficient payment of the minimum monthly amounts for periods during which it had agreed to forgo such amounts, subsequently accepted allegedly late payments, caused DocLogic to continue to purchase AmeriDoc services and to expend efforts to enhance the DocLogic brand and membership base for two more years and then announced that the Agreement was terminated because DocLogic did not get a signed waiver document.  Such conduct violates the express warranty to "use uncompromising integrity in business transactions and agrees to use good business ethics, and not to misrepresent, misinform or deceive those with whom it transacts business."  Moreover, during the few weeks leading up to the termination date, AmeriDoc and Teladoc used their communications with DocLogic to try to take away its customer, USI. Teladoc offered a matching bid to USI, but it was not accepted.  USI went with MDLive.  The eventual result of the AmeriDoc and Teladoc efforts was the loss of the customer.  AmeriDoc and Teladoc used the DocLogic client data to compete with and undermine DocLogic.

76.     AmeriDoc breached an express warranty.  AmeriDoc sold services to DocLogic, AmeriDoc made representations by promise, the representations were part of the basis of the bargain, AmeriDoc and its supposed successor in interest breached the warranty, DocLogic gave notice of breaches when it found out and DocLogic has suffered injury.

77.     In addition to its actual damages, DocLogic seeks attorney fees.

TEXAS DECEPTIVE TRADE PRACTICES ACT

78.     DocLogic incorporates the factual allegations of paragraphs 1-77.

79.    AmeriDoc has violated Chapter 17 of the Texas Business and Commerce Code (Deceptive Trade Practices Act).   Pursuant to § 17.50(a), DocLogic sues for the breach of an express warranty by AmeriDoc and its successor in interest, Teladoc.   As stated above, AmeriDoc and Teladoc have breached the express warranty that "AmeriDoc shall use uncompromising integrity in business transactions and agrees to use good business ethics, and not to misrepresent, misinform or deceive those with whom it transacts business."  DocLogic is a consumer, the Defendants can be sued under the Deceptive Trade Practices Act, the Defendants breached an express warranty and the Defendants' action was a producing cause of the Plaintiff's injuries.

80.    DocLogic seeks its economic damages and, as determined by the trier of fact, up to three times such damages as well as court costs and reasonable and necessary attorneys' fees.

81.    In the event that either Defendant seeks abatement for 60 days pursuant to § 17.501(b), DocLogic does not oppose such abatement.

TORTIOUS INTERFERENCE WITH CONTRACT

82.    DocLogic incorporates the factual allegations of paragraphs 1-81.

83.    DocLogic had valid contracts with its customers, the Defendants willfully and intentionally interfered with such contracts, the interference caused actual damage or loss to DocLogic.  AmeriDoc hindered the performance of DocLogic.

84.    DocLogic seeks its economic damages as well as court costs.

TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS

85.    DocLogic incorporates the factual allegations of paragraphs 1-84.

86.    In May of 2014, there was a reasonable probability that DocLogic would have entered into a business relationship with a third person, the Defendants intentionally interfered with that relationship, the Defendants conduct was independently tortious or unlawful in that

they violated an express warranty and a fiduciary duty not to misuse information provided by DocLogic, the interference proximately cause DocLogic injury and actual damage or loss was sustained.

87.     DocLogic seeks its economic damages as well as court costs.

## BREACH OF FIDUCIARY DUTY

88.     DocLogic incorporates the factual allegations of paragraphs 1-87.

89.     AmeriDoc and its successor in interest Teladoc stood in a fiduciary relationship with DocLogic, the Defendants breached their duty and the breaches resulted in injury to DocLogic or benefit to the Defendants.

90.     AmeriDoc maintained a continuing advisory relationship with AmeriDoc and occupied a position of trust.  DocLogic consulted with AmeriDoc with regard to sales and marketing, product modification qualification for client relationships and other matters.  At times, AmeriDoc's corporate counsel advised DocLogic.  Moreover, the Agreement provided that "AmeriDoc shall use uncompromising integrity in business transactions and agrees to use good business ethics, and not to misrepresent, misinform or deceive those with whom it transacts business."  Among other events of breach, Defendants misused customer information provided to them to undermine the efforts of DocLogic.

91.     DocLogic seeks its actual economic damages, including those for loss of revenue, loss of profits, loss of goodwill, disgorgement of fees from AmeriDoc, profits of the Defendants from their breaches of fiduciary duties and punitive and exemplary damages to the fullest extent allowed by applicable law.

## LANHAM ACT (15 USC § 1125)

92.     DocLogic incorporates the factual allegations of paragraphs 1-91.

93.     The conduct of Teladoc and AmeriDoc violated 15 USC § 1125.  In connection with services, they used in commerce false or misleading descriptions of fact or misleading representations of fact that are likely to cause confusion, or to cause mistake, or to deceive as to the services, or commercial activities by another person.  They have in commercial advertising or promotion misrepresented the nature, characteristics or qualities of another person's services or commercial activities.  DocLogic has been damaged by such acts.

94.     DocLogic seeks recovery of the Defendants' profits, any damages sustained by the Plaintiff and the costs of the action.  DocLogic seeks treble damages and reasonable attorney fees.

## TEXAS UNFAIR COMPETITION

95.     DocLogic incorporates the factual allegations of paragraphs 1-94.

96.     Despite entering into the White Label Agreement, AmeriDoc decided to compete with DocLogic, to undermine its efforts and success, to force it from the market and to accomplish such goals acting in tandem with Teladoc.  AmeriDoc and Teladoc unfairly competed with DocLogic and sought to damage its client relationships in order to make the DocLogic customers their own.

97.     Under Texas law, unfair competition is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.  The Defendants have actually committed a recognized tort or illegal act and the wrongful conduct interfered with the Plaintiff's ability to conduct its business.

98.     DocLogic seeks its actual economic damages, including those for loss of revenue, loss of profits, loss of goodwill, profits of the Defendants from their unfair competition and

punitive and exemplary damages to the fullest extent allowed by applicable law.

CONSPIRACY

99.    DocLogic incorporates the factual allegations of paragraphs 1-98.

100.    Teladoc and AmeriDoc are jointly and severally liable for their tortious conduct. They have satisfied the requirements that there is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.  The combination of Defendants consisted of two or more persons, with an object to be accomplished, a meeting of minds on the object or course of action, one or more unlawful, overt acts and damages as the proximate result.

VI.  <u>PRAYER</u>

101.    For the claims made herein against Defendants AmeriDoc and Teladoc, Plaintiff DocLogic seeks:

a.    its actual economic damages, including those for loss of revenue, loss of profits and loss of goodwill, as applicable;

b.    disgorgement of fees from AmeriDoc;

c.    profits of the Defendants from their breach of fiduciary duty;

d.    punitive and exemplary damages to the fullest extent allowed by applicable law for the claims made herein;

e.    treble damages under the Deceptive Trade Practices Act, Lanham Act and any other applicable law;

f.    reasonable attorney fees;

g.    prejudgment interest;

h.    post judgment interest;

i.      costs of court and suit;

j.      a determination that the damages are recoverable from the Defendants jointly and severally; and,

k.      all such other and further relief to which it may be found entitled at law or in equity.

Respectfully submitted,

SIEBMAN, BURG, PHILLIPS & SMITH, LLP

By: /s/ Clyde Siebman
Clyde M. Siebman
Texas Bar No. 18341600
SIEBMAN, BURG, PHILLIPS & SMITH LLP
300 North Travis
Sherman, Texas 75090
(903) 870-0070 – Telephone
(903) 870-0066 – Fax
clydesiebman@siebman.com

Bryan H. Burg
Texas Bar No. 03374500
SIEBMAN, BURG, PHILLIPS & SMITH LLP
4949 Hedgcoxe Road, Suite 230
Plano, Texas 75024
(214) 387-9100 – Telephone
(214) 387-9125 – Fax
bryanburg@siebman.com

**COUNSEL FOR PLAINTIFF**